RECEIVED

MAR 1 7 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

RAYLIN RICHARD                              CIVIL ACTION NO. 6:11-0083

-vs-                                                      JUDGE DRELL

ANADARKO PETROLEUM CORP., et al.       MAGISTRATE JUDGE HILL

## RULING

Before the Court is a "Motion for Summary Judgment" by Defendant, Hunting Energy Services, Inc. ("Hunting"), based on the Louisiana Products Liability Act, La. R.S. § 9:2800.51, *et seq.* ("LPLA"). (Doc. 133). Hunting's motion is unopposed.

Also before the Court is a "Motion for Summary Judgment" by Defendant, Anadarko Petroleum Corp. ("Anadarko"), based on general maritime law. (Doc. 135). Plaintiff, Raylin Richard, filed a response (Doc. 147) to Anadarko's "Statement of Uncontested Material Facts" (Doc. 135-2), but no other responses have been filed in connection with this motion.

We have considered the filings and evidence submitted by the parties and are prepared to rule on the pending motions in turn. For the reasons described below, both motions will be **GRANTED**.

I.    Background

This lawsuit arises out of an alleged offshore accident on the Belford Dolphin drill ship in connection with the operation of oil and gas leases in the Gulf

of Mexico. In June 2008, Anadarko E&P Company, LP ("AEP"), an independent subsidiary of Defendant, Anadarko Petroleum Corp.; Murphy Exploration & Production Company-USA; and Samson Offshore Company (collectively, "leaseholders") entered into a Joint Operating Agreement ("JOA") to develop and produce hydrocarbons in the Green Canyon Area Blocks 432 and 476 ("the Samurai Prospect"). (JOA, Doc. 79-2, Exh. A; Memorandum Ruling, Doc. 87 at pp. 1–2, n.3). The JOA designated AEP as "Operator" of the project. (JOA, Doc. 79-2, Exh. A at 4.1, 5.1). However, AEP designated its affiliate, Anadarko, to serve as the general contractor and to engage all subcontractors for the drilling of wells in the Samurai Prospect. (Siddall Affidavit, Doc. 79-1, Exh. 1).

As general contractor, Anadarko hired Dolphin Drilling Ltd. ("Dolphin") to provide drilling services under Dolphin's Offshore Daywork Drilling Contract ("Drilling Contract") (Doc. 111-5, Exh. 5). Dolphin not only furnished the Belford Dolphin drill ship, but also contracted with OCB Oilfield Services FZE ("OCB") to furnish oilfield labor services aboard the vessel. (Original Complaint, Doc. 1 at ¶ 12; Memorandum Ruling, Doc. 87 at p. 2; Fenton Deposition, Doc. 135-4, Exh. A at pp. 28, 38).[1] In addition to hiring Dolphin, Anadarko entered into individual master service contracts with Offshore Energy Services, Inc. ("OES") to provide

---

[1] Plaintiff maintains the personnel Dolphin engaged through OCB to provide oilfield labor services are employees of Dolphin. See Response by Complainant to the Statement of Uncontested Material Facts of Anadarko, Doc. 147.

casing operations ("OES–Anadarko MSC") (Doc. 111-3, Exh. 3) and with Smith International, Inc. ("Smith") to supply tubular products[2] and thread representatives[3] ("Smith–Anadarko MSC") (Doc. 111-4, Exh. 4) for the Belford Dolphin casing job. The remaining defendant, Hunting, designed and manufactured the 10 1/8-inch "Seal-Lock Semi-Flush" ("SLSF") male and female threaded casing connections and the 10 1/8-inch tubular lifting devices ("nubbins") used in the casing operations. (Original Complaint, Doc. 1 at ¶ 10).

Casing operations involve lowering each joint of casing vertically into the well hole, and then positioning it onto the casing stump (a joint of casing previously fixed in the well). In this operation, personnel would first lift a single joint of casing using one of the Belford Dolphin's cranes and place it horizontally on the rig floor, where it is prepared for insertion into the well using the nubbins. Here, Hunting designed the 10 1/8-inch nubbins to be manually assembled and inserted into the casing using a lever to tighten or "bump-up" the nubbin into the female SLSF connection.[4] After the nubbin is installed properly, personnel attach

---

[2] Anadarko requested 10 1/8-inch casing for the Belford Dolphin casing operations. (Hunting Statement of Facts, Doc. 133-3).

[3] Thread representatives are trained and certified to oversee the handling, makeup, and installation of tubular products on oilrig locations to ensure the proper running procedures are followed. In the instant case, Smith personnel were trained and certified by Hunting with respect to Hunting's "Field Running and Handling Procedures." (Perkins Report, Doc. 133-2, Exh. 3 at pp. 19–20).

[4] The "male" connection contains external threads, while the "female" connection contains internal threads. In this case, each nubbin had a male SLSF connection, while the joints of casing had female SLSF connections on one end and male SLSF connections on the other. (Memorandum in Support, Doc. 133-1 at p. 3; Perkins Report, Doc. 133-2, Exh. C at pp. 3, 6).

a single joint elevator to the casing, just below the shoulder or "lip" of the nubbin. The crew then lifts the casing into a vertical position, lowers it into the well hole, and stabs the male end of the vertical joint together with the female SLSF connection on the situated casing stump. The Belford Dolphin casing operations commenced on May 31, 2009. (Memorandum in Support, Doc. 133-1 at pp. 3–4; Perkins Report, Doc. 133-2, Exh. 3 at pp. 2–10).

Smith's thread representatives were responsible for supervising the handling, makeup, and installation of the SLSF connections and nubbins by the Dolphin and OES casing crew to ensure they were following Hunting's "Field Running and Handling Procedures" ("Running Procedures").[5] (Complaint, Doc. 1 at ¶ 11; Anadarko's Statement of Facts, Doc. 135-2; Perkins Report, Doc. 133-2, Exh. 3 at p. 20). Likewise, Anadarko maintained a "company man" on the rig to handle day-to-day business and to monitor the work of Dolphin, OES, and Smith. As the company man, Jerry Sumrall ("Mr. Sumrall") was responsible for ensuring Dolphin, OES, and Smith complied with the drilling engineer's specifications. (Sumrall Deposition, Doc. 135-6, Exh. C at pp. 16, 27).

Plaintiff was employed by OES as a casing supervisor on the Belford Dolphin. He filed the instant suit against Anadarko, Dolphin, Smith, and Hunting

---

[5] The Running Procedures document prescribes the proper protocol for installing Hunting's SLSF connections and nubbins. Hunting requires Smith and other companies that are contracted to run Hunting's tubular products to bring the field running documents, including Hunting's Running Procedures, to the job site. (Perkins Report, Doc. 133-2, Exh. 3 at pp. 19–20).

to recover damages for injuries he allegedly sustained on June 1, 2009, while working on the drill floor during casing operations. Plaintiff claims the casing crew was lifting a joint of casing when the nubbin suddenly became detached, causing the casing to fall on top of Plaintiff and to crush him against the drill floor. (Memorandum Ruling, Doc. 87, at pp. 1–2, n.1–5).

Plaintiff filed an "Original Complaint for Damages" (Doc. 1) on January 25, 2011, in the United States District Court for the Western District of Louisiana, Lafayette Division,[6] alleging causes of action under general maritime law and the Jones Act, 46 U.S.C. § 30104. Plaintiff designated his claims, pursuant to Fed. R. Civ. P. 9(h), as claims for relief under the Court's admiralty or maritime jurisdiction. On July 7, 2011, Plaintiff amended and supplemented his original complaint by asserting negligence and strict liability claims under general maritime law and the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), rather than the Jones Act. (Doc. 26). Plaintiff also amended his complaint to add Louisiana substantive law as an alternative basis for relief.

In addition to asserting negligence and strict liability claims against Defendants collectively, Plaintiff alleges products liability claims solely against Hunting and Smith in their respective capacities as manufacturer and installer of

---

[6] This case was originally assigned to Judge Doherty in the Lafayette Division. However, it was reassigned to us on August 29, 2013. See Docs. 141, 144.

the SLSF connections and nubbins.[7] Plaintiff does not reference the LPLA in his original or amended complaints, but the parties do not dispute that Plaintiff's claims against Hunting are governed by the LPLA.[8] Various defendants have asserted other contractual indemnity and insurance coverage claims in this litigation. However, those claims are not relevant to the instant motions and will not be discussed here.

## II.   Motions for Summary Judgment

### A.   Hunting Energy Services, Inc.

On July 24, 2013, Hunting filed its Motion for Summary Judgment, seeking dismissal of Plaintiff's LPLA claims. (Doc. 133). According to Hunting, Plaintiff has not produced evidence that: (1) the casing connection or nubbin used at the time of Plaintiff's accident ("the incident") was unreasonably dangerous in construction or composition; (2) an alternative design existed at the time the products left Hunting's control; (3) Hunting failed to provide an adequate warning regarding the connections and nubbins; or (4) Hunting made an express warranty regarding the

---

[7]  Plaintiff alleges Hunting and Smith are liable for: (1) inadequate design, manufacture, marketing, construction, and/or installation of the connections and/or nubbins; (2) unreasonable construction, composition, and/or installation of the connections and/or nubbins;(3) failure to provide adequate warnings, instructions, and training regarding the connections and/or nubbins; (4) failure of the connections and/or nubbins to conform to express or implied warranties; (5) causing an unreasonable risk of harm to Plaintiff during normal use, foreseeable misuse, and/or reasonably anticipated use of the connections and/or nubbins; and (6) failure properly to inspect, supervise, or otherwise implement proper control over installation of the connections and/or nubbins in the Anadarko well. (Doc. 26, ¶ IV).

[8]  In a status conference with this Court on November 6, 2013, counsel informed the Court of the following: (1) there is no opposition to the instant motions; and (2) there is no dispute that Plaintiff's claims against Hunting arise solely under the LPLA.

connections and nubbins, which induced Anadarko to use Hunting's products. Thus, Hunting contends there is no genuine dispute of material fact that Plaintiff cannot sustain his burden of proof under the LPLA.[9] As noted above, the parties do not oppose Hunting's summary judgment motion.

### B.    Anadarko Petroleum Corp.

Anadarko filed its Motion for Summary Judgment on July 24, 2013, seeking dismissal of Plaintiff's general maritime tort claims against it. (Doc. 135). Anadarko alleges there is no genuine dispute of material fact that Dolphin, OES, and Smith are independent contractors pursuant to their respective agreements with Anadarko. Further, Anadarko alleges there is no genuine dispute that it exercised no actual control over the operations of OES, Smith, or Dolphin. Given these facts, Anadarko argues maritime law does not impose a duty on Anadarko to discover or remedy any hazard created by its independent contractors or their employees.

Plaintiff filed a "Response by Complainant to the Statement of Uncontested Material Facts of Anadarko Petroleum Corporation" (Doc. 147), denying allegations that OCB personnel working aboard the Belford Dolphin were not employees of Dolphin. Plaintiff also denies allegations regarding his physical positioning on the

---

[9] Finding no dispute as to the actual substantive law governing Plaintiff's claims against Hunting or Anadarko, we do not address Hunting's alternative argument that general maritime law recognizes the Restatement of Torts as dispositive of the issues.

rig at the time of the accident.[10] Plaintiff does not deny the remaining facts set forth in Anadarko's "Statement of Uncontested Material Facts" (Doc. 135-2), and Anadarko's motion is otherwise unopposed.

III.   **Law and Analysis**

A.   **Summary Judgment Standard**

A court "shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion." Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983). When the nonmovant ultimately would bear the burden of proof at trial, however,  the movant may satisfy its summary judgment burden by showing the absence of evidence in the record to establish an essential element of the nonmovant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). It is important to note the standard for summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to judgment as a matter of law.

A court cannot grant summary judgment simply because the nonmovant fails to oppose the motion, even if the failure to oppose violates a local rule.

---

[10] Anadarko's factual statement describes Plaintiff as standing on the drill floor "next to the joint [or stump] in the rotary." (Doc. 135-2, No. 13).

Hibernia Nat. Bank v. Administracion Cent. Sociedad Anonima, 776 F.2d 1277, 1279 (5th Cir. 1985). The moving party bears "the burden of establishing the absence of a genuine [dispute] of material fact and, unless he has done so, the court may not grant the motion, regardless of whether any response was filed." Id. However, in this District, Local Rule 56.2 gives added direction when summary judgment is unopposed: "All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for the purposes of the motion, unless controverted as required by this rule."

Because Hunting's summary judgment motion is unopposed, all facts set forth in Hunting's "Statement of Uncontested Facts" (Doc. 133-3) are deemed as true for purposes of this decision. Likewise, all facts set forth in Anadarko's statement (Doc. 135-2), which were not denied by Plaintiff, are deemed as true for purposes of this decision.

### B.   Louisiana Products Liability Act

The LPLA establishes the exclusive theory of liability for manufacturers regarding damages caused by their products and is set forth in La. R.S. § 9:2800.51, et seq. The applicable standard under the LPLA is as follows:

> The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

La. R.S. § 9:2800.54(A). Thus, to maintain a successful claim under the LPLA, a claimant must establish four elements:

(1)    that the defendant is a manufacturer of the product;

(2)    that the claimant's damage was proximately caused by a characteristic of the product;

(3)    that this characteristic made the product "unreasonably dangerous;" and

(4)    that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else.

Ayo v. Triplex, Inc., 457 F. App'x 382, 385–86 (5th Cir. 2012).[11]

A product is "unreasonably dangerous" under the LPLA in one of four ways: (1) construction or composition; (2) design; (3) inadequate warning; or (4) failure to conform to an express warranty. La. R.S. § 9:2800.54(B). The "unreasonably dangerous" characteristic must exist at the time the product left the manufacturer's control or result from a reasonably anticipated modification or alteration of the product. Id. § 2800.54(C). Louisiana law does not permit a factfinder "to presume an unreasonably dangerous condition solely from the fact that injury occurred." Woodling v. Hubbell Inc., 35 F. App'x 386, *4 (5th Cir. 2002).[12] Rather, the claimant has the burden of proving the required elements under the LPLA. La. R.S. § 9:2800.54(D).

————————————————

[11] Citing Jack v. Alberto–Culver USA, Inc., 949 So. 2d 1256, 1258  (La. 2007) (citing La. R.S. § 9:2800.54(A)).

[12] Citing Krummel v. Bombardier Corp., 206 F.3d 548, 551 (5th Cir. 2000) (quoting McCarthy v. Danek Med., Inc., 65 F. Supp. 2d 410, 412 (E.D. La. 1999)).

With respect to the first element—that the defendant is a manufacturer—there is no dispute Hunting manufactured the 10 1/8-inch SLSF casing connections, as well as the 10 1/8-inch nubbin, used by the Belford Dolphin crew at the time of Plaintiff's accident. (Hunting's Statement of Facts, Doc. 133-3). As to the second and third elements, however, Plaintiff's LPLA claims fail. Hunting correctly argues that Plaintiff has offered absolutely no summary judgment evidence to support his construction or composition, design defect, inadequate warning, or express warranty claims. Each of these claims will be discussed in turn.

      *1.    <u>Construction or Composition</u>*

The "construction or composition" provision of the LPLA affords "a remedy for damages caused by a product that is defective due to a mistake in the manufacturing process." <u>Stahl v. Novartis Pharm. Corp.</u>, 283 F.3d 254, 263 (5th Cir. 2002) (citing La. R.S. § 9:2800.55). To maintain such a claim successfully, Plaintiff must prove, "at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. R.S. § 9:2800.55; <u>Stahl</u>, 283 F.3d at 261.

In the instant case, the undisputed facts show the crew successfully lifted 179 joints of casing prior to Plaintiff's accident. (Hunting's Statement of Facts, Doc.

133-3; Sumrall Deposition, Doc. 133-2, Exh. 8 at p. 214). Post-incident visual inspections of the casing and nubbin revealed no abnormalities in or damage to the internal threads. (Hunting's Statement of Facts, Doc. 133-3). After the accident, Mr. Sumrall measured the diameter of the incident nubbin and found it to be correct. (Sumrall Deposition, Doc. 133-2, Exh. 8 at pp. 209–10). Likewise, Plaintiff's expert, Gregg Perkins ("Mr. Perkins"), conducted his own examination of the incident nubbin and concluded that it "did not have any thread damage and that it made-up properly to a Joint of Casing." (Perkins Report, Doc. 133-2, Exh. 3 at p. 21). According to the expert report, the joints of casing could have been lifted safely "if Smith had ensured that each and every nubbin had been properly installed into its respective Joint of Casing." (Doc. 133-2, Exh. 3 at p. 22). Moreover, when asked about his opinion regarding defects in the "manufacture or make-up" of Hunting's product, Mr. Perkins testified as follows:

> Q:    . . . I need[ ] to know if you're going to give an opinion at trial that there was anything defective with the Hunting product in its design, manufacture or make-up?
>
> A:    I don't have any opinions in those regards, whatsoever.
>
> Q:    And you're not waiting on any information to formulate that opinion, are you?
>
> A:    No, I'm not. . . . [T]he only thing that I . . . think is a little problematic, but I think Hunting addresses it, is the fact that you've got to screw in the nubbin and bump it up. It's not a tight connection, as I would call it. But if you manage it properly . . . it should be okay.

12

> Q:   And there were folks on that ship who knew how to manage it
>       properly, correct?
>
> A:   Certainly. That's what Smith was out there for and that's what
>       they should have done.

(Perkins Deposition, Doc. 133-2, Exh. 9 at p. 104).

Plaintiff has provided no evidence suggesting the incident connection or nubbin deviated in any way from Hunting's production standards or from its otherwise identical products. Accordingly, summary judgment is appropriate as to Plaintiff's construction or composition claim.

### 2.   *Design Defect*

As with construction/composition, Plaintiff has produced no evidence to support his design defect claim. Under § 9:2800.56 of the LPLA, a product is unreasonably dangerous in its design if, when the product left the manufacturer's control:

(1)   There existed an alternative design for the product that was capable of preventing the claimant's damage; and

(2)   The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

This test requires Plaintiff to prove both "that an alternative design existed" at the time the product was manufactured, and "that the risk avoided by using the alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design

13

(added construction costs and loss of product utility)." Roman v. W. Mfg., Inc., 691 F.3d 686, 700–01 (5th Cir. 2012) (citing Lawrence v. Gen. Motors Corp., 73 F.3d 587, 590 (5th Cir. 1996)).

Here, Plaintiff has failed to submit any evidence that an alternative design existed at the time the products left Hunting's control or that Plaintiff's injuries would have been prevented by the alternative design as required by § 9:2800.56(1). To reemphasize, an unreasonably dangerous design cannot be presumed simply because Plaintiff was injured.  Woodling, 35 F. App'x at *4. Plaintiff has the burden of producing "scientifically viable evidence to show that the alternative design would have prevented [his] injuries," which he has failed to do. Broussard v. Procter & Gamble Co., 463 F. Supp. 2d 596, 611 (W.D. La. 2006) (citations omitted). Similarly, Plaintiff has provided no evidence regarding the risk/utility balance as required by § 9:2800.56(2). Therefore, Hunting is entitled to summary judgment as to Plaintiff's design defect claim.

### 3.   *Inadequate Warning*

To prevail on a failure-to-warn claim under the LPLA, Plaintiff must demonstrate that: (1) the product in question had, at the time it left the manufacturer's control, "a potentially damage-causing characteristic;" and (2) "the manufacturer failed to use reasonable care to provide an adequate warning about

14

this characteristic." <u>Stahl</u>, 283 F.3d at 264.[13] However, a manufacturer does not

have a duty to warn when:

> (1)    The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or

> (2)    The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

La. R.S. § 9:2800.57(B).

Relying on the exceptions in § 9:2800.57(B), Hunting argues that Anadarko

and its contractors are sophisticated entities who were familiar with the hazards

of casing operations at the time of Plaintiff's accident and therefore suggests there

was no duty to warn. (Memorandum in Support, Doc. 133-1 at p. 16). Plaintiff does

not dispute Hunting's suggestion that no warning was required under the LPLA.

In fact, Plaintiff has not provided any evidence showing the incident connection or

nubbin had a potentially damaging characteristic at the time they left Hunting's

control. Thus, Plaintiff's defective warning claims fail at the threshold.

Assuming *arguendo* the products had a potentially damaging characteristic,

there is no genuine dispute that Hunting provided two written warnings regarding

the dangers of nubbin use in the form of Hunting's "Field Running and Handling

Procedures" provided to Smith personnel and individual warning labels for each

---

[13] Citing <u>Grenier v. Med. Eng'g Corp.</u>, 243 F.3d 200, 205 (5th Cir. 2001). <u>See also</u> La. R.S. § 9:2800.57(A).

nubbin. (Hunting's Statement of Facts, Doc. 133-3). Accordingly, we will focus our attention on the adequacy of these warnings.

The LPLA defines "adequate warning" as "a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made." La. R.S. § 9:2800.53(9). The Fifth Circuit has rejected the notion that the adequacy of a warning necessarily presents a genuine dispute of material fact for a jury to decide. Stahl, 283 F.3d at 264 (citations omitted). Moreover, the appellate court has held "[a] 'mere allegation of inadequacy' is insufficient for a plaintiff to survive summary judgment on a failure-to-warn claim." Id.

In the instant case, Hunting provided Smith with its "Field Running and Handling Procedures," which contain the following warning:

> Prior to lifting SEAL-LOCK FLUSH and SEAL-LOCK SF (Semi Flush) lift plugs must be shouldered with the external box shoulder. Failure to do so may cause the lift plug to disengage, which may result in the pipe failing. This may cause connection damage, property damage, bodily injury or loss of life.

(Perkins Report, Doc. 133-2, Exh. 3 at p. 20; Hunting's Statement of Facts, Doc. 133-3). Hunting's Director of Quality Assurance, Greg Farmer, testified that Hunting requires Smith personnel to bring a copy of the Running Procedures to the casing operations site. (Farmer Deposition, Doc. 133-2, Exh. 4 at p. 69). Matthew

McKissick ("Mr. McKissick"), Smith's thread representative, who was working at the time of Plaintiff's accident, was responsible for monitoring personnel on the rig floor to ensure they were "running" the casing per Hunting's Running Procedures. By his own admission, Mr. McKissick received and reviewed the Running Procedures before he began the Belford Dolphin job. (McKissick Deposition, Doc. 133-2, Exh. 5 at pp. 57–58, 88–89).[14]

In addition, Hunting provided Smith with individual warning labels for the nubbins, which contained essentially the same warning found in the Running Procedures.[15] Based on the undisputed facts, Smith was supposed to attach these warning labels to the nubbins it delivered to the Belford Dolphin. (Hunting's Statement of Facts, Doc. 133-3). As to the sufficiency of Hunting's warnings, Plaintiff's expert provided the following assessment in his report:

> Per the Hunting Field Running and Handling Procedures, the Lifting Nubbins were supposed to be shouldered. It's apparent from the loose Lifting Nubbins being observed; [sic] several times the Lifting Nubbins must not have been shouldered allowing them to partially disengage from the Female end of the Casing Joint. . . . Smith should have

———————————————

[14] When asked about Hunting's Running Procedures, Mr. McKissick stated as follows:
  A: Yes, sir. I would have been handed this before the job, I believe.
  Q: On the Anadarko job?
  A: Yes, sir.
  Q: Would that have been . . . part of the job packet?
  A: Yes, sir, best I can recall.
  Q: Did you use this . . . written procedure? In other words, did you refer to it and adjust your work on the rig?
  A: Yes, sir. Most likely I would have read this before the job.
(McKissick Deposition, Doc. 133-2, Exh. 5 at pp. 88–89).

[15] Hunting alleges "the red warning tag attached to the nubbin . . . stated the lift nubbins must be shouldered with the casing or they could drop." (Memorandum in Support, Doc. 133-1 at pp. 17, 7).

> ensured that Hunting's Field Running and Handling Procedures were
> being followed and that prior to any lift utilizing a Nubbin, that it had
> been properly installed and tightened. . . . Based upon all of the facts
> presented to me with regard to this incident, Smith should have had
> knowledge of all of the dangers associated with any Casing Joint's lift
> and their use of this Hunting Nubbin.

(Perkins Report, Doc. 133-2, Exh. 3 at p. 21). Plaintiff has failed to raise a genuine

dispute of material fact regarding the adequacy of Hunting's warnings, therefore

summary judgment is appropriate as to Plaintiff's warning defect claims.

### 4.    *Failure to Conform to Express Warranty*

Section 9:2800.58 of the LPLA provides:

> A product is unreasonably dangerous when it does not conform to an
> express warranty made at any time by the manufacturer about the
> product if the express warranty has induced the claimant or another
> person or entity to use the product and the claimant's damage was
> proximately caused because the express warranty was untrue.

Thus, an express warranty claim requires proof that: "(1) the manufacturer made

an express warranty regarding the product, (2) the plaintiff was induced to use the

product because of that warranty, (3) the product failed to conform to that express

warranty, and (4) the plaintiff's damage was proximately caused because the

express warranty was untrue." Broussard, 463 F. Supp. 2d at 611 n.11.

Turning to the first element—existence of an express warranty—the LPLA

sets forth the following definition: "'Express warranty' means a representation,

statement of alleged fact or promise about a product or its nature, material or

workmanship that represents, affirms or promises that the product or its nature,

material or workmanship possesses specified characteristics or qualities or will

18

meet a specified level of performance." La. R.S. § 9:2800.53(6). Again, Plaintiff has advanced no argument or evidence to raise a genuine dispute of material fact that Hunting made any express warranties to Anadarko or Smith concerning the SLSF casing connections or nubbins. For these reasons, Hunting's Motion for Summary Judgment will be **GRANTED**.

### C.   Principal's Liability for Independent Contractors

It is well-established under general maritime law that "[a] principal is not liable for the torts of an independent contractor unless the principal exercises operational control over or expressly or impliedly authorizes the independent contractor's actions." Landry v. Huthnance Drilling Co., 889 F.2d 1469, 1471 (5th Cir. 1989) (citations omitted). The Fifth Circuit has explained the "operational control" test as follows:

> In order for a principal to be liable for the actions of an independent contractor, the principal must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations. Such a general right is usually reserved to employers, but this does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of right of supervision that the contractor is not entirely free to do the work in his own way.

Id. (citations omitted).

The principal–independent contractor relationship is determined, in large measure, by the terms of their agreement. Ham v. Pennzoil Co., 869 F.2d 840, 842

(5th Cir. 1989) (applying Louisiana law under Civil Code articles 2315 and 2317).

The Fifth Circuit has determined that a principal does not retain control over its independent contractor "[w]hen the contract assigns the independent contractor responsibility for its own activities." Fruge ex rel. Fruge v. Parker Drilling Co., 337 F.3d 558, 564 (5th Cir. 2003) (citations omitted) (applying Louisiana negligence law as surrogate federal law pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*).

Here, the undisputed facts establish that Anadarko engaged Dolphin, OES, and Smith as independent contractors and that Anadarko did not contractually reserve the right to direct or control their operations. In fact, each contract provides Anadarko "shall have no direction or control" over the independent contractors' operations, "except in the results to be obtained."(Anadarko's Statement of Facts, Doc. 135-2; OES–Anadarko MSC, Doc. 111-3, Exh. 3 at ¶ 8; Smith–Anadarko MSC, Doc. 111-4, Exh. 4 at ¶ 8; Drilling Contract, Doc. 111-5, Exh. 5 at ¶ 105). Thus, there is no dispute concerning Anadarko's lack of contractual authority to control the operations of its independent contractors.

Nevertheless, we also must consider whether Anadarko's actual practices amount to operational control. See Morgan v. Hercules Drilling Co., LLC, 2011 WL 2793229, *3 (W.D. La. July 13, 2011).[16] In the instant case, Anadarko maintained

---

[16] "[T]he terms of a contract, while relevant, do not necessarily determine the outcome" of the operational control inquiry. Id. (citations omitted). Courts typically look "beyond the contract to determine whether the principal's actions constitute operational control." Id. (quoting Dixon v. Danos and Curole Marine Contractors, Inc., 1998 WL

its company man, Mr. Sumrall, on the Belford Dolphin to monitor the work of its independent contractors. However, the physical presence of a "company man" or representative of the principal, even one making periodic inspections or providing instructions to achieve certain results, is not sufficient, in and of itself, to show operational control. Id.[17] A principal's actions constitute operational control "only if the principal has direct supervision over the step-by-step process of accomplishing the work." Fruge, 337 F.3d at 564 (citations omitted). Moreover, the Fifth Circuit has found a principal generally is not liable under the operational control exception "absent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury." Id. (quoting Coulter v. Texaco, 117 F.3d 909, 912 (5th Cir. 1997)).[18]

In this case, it is clear to us that Anadarko's actions do not amount to operational control. First, Mr. Sumrall was responsible for ensuring the casing operations were conducted according to "the drilling engineer's specifications and drilling program." (Sumrall Deposition, Doc. 135-6, Exh. C at pp. 16, 27). He was not responsible for and did not supervise the details of the work performed by

---

812393, *2 (E.D. La. Nov. 16, 1998) (citing Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 193 (5th Cir. 1991) (reviewing actual control asserted by a principal over its independent contractor after examining the terms of their contract))).

[17] Citing Duplantis, 948 F.2d at 193; Landry, 889 F.2d at 1471–72. See also, e.g., Ham, 869 F.2d at 842; Wallace v. Oceaneering Int'l, 727 F.2d 427, 436–37 (5th Cir. 1984).

[18] See also, Bartholomew v. CNG Producing Co., 832 F.2d 326, 329–30 (5th Cir. 1987) (finding operational control where a company man instructed the crew against cleaning the rig floor, the condition of which directly caused the plaintiff's accident).

Dolphin, OES, or Smith. (Anadarko's Statement of Facts, Doc. 135-2). Rather, the independent contractors furnished their own supervisors, such as Plaintiff, directly to oversee the casing operations. These supervisors conducted safety meetings, inspected the equipment, and instructed the crew during the course of the casing operations. (Lanthier Deposition, Doc. 135-9, Exh. F at pp. 12–13, 21–22; Richard Deposition, Doc. 135-13, Exh. J at pp. 31, 39–40; McKissick Deposition, Doc. 135-15, Exh. L at p. 164; Griffin Deposition, Doc. 135-19, Exh. O at p. 82).

Further, there is no proof Mr. Sumrall either was supposed to give or actually gave orders to the independent contractors or their employees at the time of Plaintiff's accident. In fact, Mr. Sumrall was not informed, and thus was ignorant, of any issues regarding the installation or tightening of the nubbins prior to the accident. (Anadarko's Statement of Facts, Doc. 135-2). On the other hand, the undisputed evidence shows Plaintiff received multiple notifications that "the nubbins were loose" and instructed the crew as to the proper tightening procedure, even giving them a physical demonstration. (Richard Deposition, Doc. 135-13, Exh. J at pp. 31, 39–40; Quebedeaux Deposition, Doc. 135-14, Exh. K at pp. 27–28).

The Fifth Circuit consistently has held "on similar facts that a principal, such as Anadarko, who hires independent contractors over which [it] exercises no operational control has no duty to discover and remedy hazards created by its independent contractors." Fruge, 337 F.3d at 564 (quoting Wallace v. Oceaneering

Int'l, 727 F.2d 427, 437 (5th Cir. 1984)). Accordingly, Anadarko's Motion for Summary Judgment will be **GRANTED**.

IV.   **Conclusion**

For the reasons explained herein, the Motion for Summary Judgment by Hunting Energy Services, Inc. (Doc. 133) will be **GRANTED**, and the Motion for Summary Judgment by Anadarko Petroleum Corp. (Doc. 135) will be **GRANTED**. Plaintiff's claims against these two defendants will be **DISMISSED** with **PREJUDICE**.


SIGNED on this 17 day of March, 2014 at Alexandria, Louisiana.


DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

23