RECEIVED

MAR 2 4 2015

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

RAYLIN RICHARD

-vs-

ANADARKO PETROLEUM CORP., et al.

CIVIL ACTION NO. 6:11-cv-0083

JUDGE DRELL

MAGISTRATE JUDGE HILL

## RULING

Pending before the Court is a Motion for Summary Judgment (Doc. 200) filed by Liberty Mutual Insurance Company ("Liberty Mutual"); a Motion for Reconsideration (Doc. 211) filed by Anadarko Petroleum Corp. ("Anadarko"); and a Motion for Reconsideration (Doc. 222) filed jointly by Dolphin Drilling, Ltd. ("Dolphin"), Smith International, Inc. ("Smith"), and Offshore Energy Services, Inc. ("OES"). We have considered the filings and evidence in the record and the parties' arguments contained in their briefs and are prepared to rule on the pending motions. For the following reasons, the Motion for Summary Judgment (Doc. 200) will be **DENIED** and the Motions for Reconsideration (Docs. 211, 222) will be **GRANTED**.

I.     Background

This lawsuit arises out of an alleged offshore accident on the Belford Dolphin drill ship in connection with the operation of oil and gas leases in the Gulf of Mexico. In June 2008, three companies: (1) Anadarko E&P Company, LP (an independent subsidiary of Defendant Anadarko); (2) Murphy Exploration & Production Company-USA; and (3) Samson Offshore Company entered into a Joint Operating Agreement to

develop and produce hydrocarbons in the Green Canyon Area Blocks 432 and 476 ("the Samurai Prospect") (Docs. 79-2, 87). The Joint Operating Agreement designated Anadarko E&P Company as "Operator" of the project. (Doc. 79-2). However, Anadarko E&P Company designated its affiliate, Anadarko, to serve as the general contractor and to engage all subcontractors for the drilling of wells in the Samurai Prospect (Doc. 79-1).

As general contractor, Anadarko hired Dolphin Drilling Ltd. ("Dolphin") to provide drilling services under Dolphin's Offshore Daywork Drilling Contract (Doc. 111-5). Additionally, Anadarko, through preexisting master service contracts, hired OES to provide casing operations (see doc. 111-3) and Smith International, Inc. ("Smith") to supply tubular products and thread representatives (see doc. 111-4) for the Belford Dolphin casing job.

The preexisting master service contract between OES and Anadarko (the "OES-Anadarko Contract") was signed on November 1, 2000 (Doc. 111-3). The contract contained reciprocal indemnity clauses that required OES to indemnify Anadarko, "its Affiliates, its joint owners and venturers, if any, and its and their directors, agents, representatives, employees and insurers and its subcontractors and their employees" for bodily injury to employees of OES or OES's subcontractors and for Anadarko to do likewise (Doc. 74-1).[1] The contract also contained an insurance clause that required each party to carry various types of insurance, including comprehensive general liability coverage for "contractual liability for those liabilities assumed by the Party herein." Id. At the time OES was involved in the

---

[1] The indemnification clauses covered additional liability, but the Court focuses only on liability for bodily injury because this case arises out of a claim for bodily injury by an OES employee.

Samurai Prospect, OES had a commercial general liability policy with Liberty Mutual (the "Policy") (See doc. 60-3). OES also had purchased a "Blanket Additional Insured Endorsement," which amended the Policy's definition of "who is an insured" to include "any person or organization for whom [OES has] agreed *in writing* to provide liability insurance" (Doc. 60-3) (emphasis added).

In June 2009, Plaintiff Raylin Richard, a casing supervisor employed by OES, was struck and injured by a falling joint of casing while on the drill ship Belford Dolphin. Plaintiff brought a tort suit against the companies involved in the drilling operation: Dolphin, Smith, and Anadarko.[2] Dolphin and Smith tendered their defense and indemnification to Anadarko per the indemnity provisions of their individual contracts (See Doc. 87). Anadarko then tendered the defense and indemnification of Dolphin, Smith, and itself to OES. See id.

OES accepted the defense and indemnification of Anadarko, Smith, and Dolphin because OES believed the OES-Anadarko Contract required them to defend and indemnify each of those three companies for liability to an OES employee (Doc. 111). Because OES had so agreed *in writing*, OES submitted the defense and indemnification to Liberty Mutual for coverage under the Blanket Additional Insured Endorsement. Id.

After OES submitted the insurance claim, Liberty Mutual thoroughly reviewed the contract between OES and Anadarko, allegedly for the first time, and made three important determinations about coverage: (1) Anadarko was an additional insured

---

[2] Plaintiff also sued the manufacturer of the lifting connection, Hunting Energy Services, Inc., but the claims against Hunting were dismissed (Doc. 133) and are not relevant to the motions at hand. OES was also a company involved in the operation, but Plaintiff was prohibited from suing OES because of workers' compensation laws.

under the Policy because OES agreed *in writing* to provide insurance for Anadarko's potential tort liability to Plaintiff Richard; (2) the Policy did not cover contractual liability, including Anadarko's assumed contractual liability to Dolphin and Smith; and (3) Dolphin and Smith were not additional insureds under the Policy because OES only agreed in writing to insure Anadarko's *subcontractors* and not Anadarko's *contractors*, which Liberty Mutual determined them to be (See docs. 87, 111, 222). Liberty Mutual concluded that Smith and Dolphin did not qualify as "subcontractors" under the OES-Anadarko Contract after looking at each of Smith's and Dolphin's respective service contracts with Anadarko in which they each were referred to by the defined term "Contractor" (Docs. 111-4, 111-5).

The first paragraph of the Master Service Contract between Anadarko and Smith is as follows:

> This Master Service Contract (the "Agreement"), is made this 26 [sic] day of August, 1999, (the "Effective Date"), by and between Anadarko Petroleum Corporation, a Delaware corporation, hereinafter called "Company", and Smith International, Inc. *and its affiliated divisions*, hereinafter called "Contractor". (Company and Contractor being referred to herein collectively as the "Parties", and individually as a "Party").[3]

(Doc. 11-4). Thereafter, the two companies are referred to throughout the contract only by those defined terms (*i.e.*, Company, Contractor, Party, and Parties). See id.

The first paragraph of the Daywork Drilling Contract between Anadarko and Dolphin is as follows:

> THIS DAYWORK DRILLING CONTRACT – OES (the "Contract"), is made between ANADARKO PETROLEUM CORPORATION ("Operator"), a corporation organized under the laws of Delaware, whose address is 1201 Lake Robins Dr., The Woodlands, Texas 77380, and Dolphin

---

[3] Underlined text denotes "fill-in the blank" lines in the contract. Italics denote hand written text.

Drilling Ltd, ("Contractor"), a corporation organized under the laws of England located at Howe Moss Drive, Kirkhill Estate, Dyce Aberdeen AB21 0GL, UK.

(Doc. 11-5). Thereafter, the two companies are referred to throughout the contract only by those defined terms (*i.e.*, Operator and Contractor). See id.

### A. Procedural History of the Pending Motions

Upon Liberty Mutual's denial of coverage for Dolphin's and Smith's tort liability and Anadarko's contractual liability to them, Anadarko filed a third party complaint impleading OES and Liberty Mutual into the case (Doc. 30). Dolphin also filed a third party complaint against OES and Liberty Mutual (Doc. 32). Liberty Mutual then moved for summary judgment on the third party claims asserted against it (Doc. 60), which Judge Doherty in the Lafayette Division of this Court granted, dismissing the claims with prejudice (Docs. 87, 89).[4]

Meanwhile, OES filed a crossclaim against Liberty Mutual to provide insurance coverage for OES's contractual liability to Dolphin, Smith, and Anadarko for indemnification and defense (Doc. 86). Liberty then moved for summary judgment on OES's crossclaim (Doc. 91). In light of OES's crossclaims, Anadarko filed a Motion for Reconsideration (Doc. 105) of the Court's previous Memorandum Ruling (Doc. 87). Judge Doherty granted Liberty Mutual's summary judgment motion (Doc. 91), dismissing OES's claims with prejudice, and denied Anadarko's reconsideration motion (Docs. 125, 126). Judge Doherty determined that the record was insufficient to determine the issue of contract reformation and allowed leave for additional filings in that regard. OES (Doc. 127) and Anadarko (Doc. 131) then moved the Court to

---

[4] The Court's Ruling did not dismiss OES's claims against Liberty Mutual because OES had not yet asserted any claims.

reconsider and sought leave from the Court to reform their contract to correct a mutual mistake, namely, failing to include the word "contractors" in each list of indemnitees.

Soon thereafter the case was reassigned from the Lafayette Division to Alexandria (Doc. 144). Dolphin and Smith (Doc. 151) and OES (Doc. 152) filed counterclaims against Liberty Mutual. Additionally, OES filed a third party complaint against its excess insurance carrier, Valiant Insurance Company ("Valiant") (Doc. 171). Considering our dismissal of Plaintiff's claims against Anadarko and another party (Doc. 176), we denied both motions for reconsideration (Docs. 127, 131) with the right to refile in one-page Order (Doc. 177). Anadarko (Doc. 211) and OES, Smith, and Dolphin (Doc. 222) timely moved this Court to reconsider the Ruling (Docs. 125, 126). These are the present motions. These motions are opposed by both Liberty Mutual (Doc. 223) and Valiant (Doc. 224). Also, pending is a motion for summary judgment filed by Liberty Mutual (Doc. 200), which is opposed by Dolphin and Smith (Doc. 209).

## II.   Law and Analysis

The issue upon which everything else turns is whether we should grant the equitable remedy of contract reformation to OES and Anadarko. Judge Doherty previously ruled that, as the OES-Anadarko Contract currently stands, Liberty Mutual does not owe a duty to defend or indemnify Dolphin, Smith, or Anadarko[5] under the Policy (Docs. 87, 89, 125, 126). Yet, OES and Anadarko now contend that their intent

---

[5] Liberty Mutual had recognized its duty to defend and indemnify Anadarko as to Anadarko's direct tort liability to Plaintiff, but, because Plaintiff's claims against Anadarko were dismissed, see docs. 175, 176, Anadarko's only remaining potential liability is contractual liability to Dolphin and Smith, which Liberty Mutual refuses to cover.

was for employers, in this case OES, to accept liability for injury[6] to their own employees (of which Mr. Richard is one) by indemnifying the other companies out on the rig. In turn, employers, such as OES, would be indemnified for their potential liability to others' employees. According to the record, they sought to effect this arrangement through a "knock for knock" indemnity scheme. This was theoretically possible because, on an oil rig in the Gulf of Mexico, all potential tortfeasors had contractual relationships with one another (usually through Anadarko), which allows them to modify the normal fault-based allocation of tort liability by agreement. OES and Anadarko contend the fact that the written OES-Anadarko Contract did not accurately reflect this agreement is because of a mutual error.

The Court has already decided that the OES-Anadarko Contract is a maritime contract subject to federal maritime law, but that "there is no maritime rule addressing the specific issue of reformation of a contract when a third party (here, Liberty Mutual) may be adversely affected" (Doc. 125).

A.   Choice of Law

The first step in our analysis is to decide which law to apply. "'If the laws of the states do not conflict, then no choice-of-law analysis is necessary,' and we simply apply the law of the forum state." Mumblow v. Monroe Broad., Inc., 401 F.3d 616, 620 (5th Cir. 2005) (quoting Schneider Nat'l Transp. v. Ford Motor Co., 280 F.3d 532, 536 (5th Cir. 2002); see also W.R. Grace & Co. v. Cont'l Cas. Co., 896 F.2d 865, 874 (5th Cir. 1990) ("[W]here the substantive decisional law of all relevant jurisdictions is the same, a court need not go through the motions of making a choice of law."). Where

---

[6] The indemnity provisions covered more than injury to employees, but that is the relevant issue in this case as liability to Plaintiff Richard is for bodily injury.

the parties are unable to identify any conflicts in the decisional law of the states, the court may proceed with the application of forum law. See Pioneer Exploration, L.L.C. v. Steadfast Ins. Co., 767 F.3d 503, 512 (5th Cir. 2014).

As the United States Court of Appeals for the Fifth Circuit has observed, "Texas law favors reformation of agreements to reflect the intention of the parties correctly," Midland West Corp. v. FDIC, 911 F.2d 1141, 1145 (5th Cir. 1990), and, "Louisiana law clearly allows contract reformation[, which is] an equitable remedy designed to correct an error in the contract," Fruge v. Amerisure Mut. Ins. Co., 663 F.3d 743, 748 (5th Cir. 2011). Contract reformation does not change the terms of the agreement, but merely reforms the writing to reflect to true terms of the agreement. Valhi, Inc. v. Zapata Corp., 365 So. 2d 867, 870 (La. Ct. App. 1978); The Automobile Ins. Co. of Hartford, Conn. v. United Electric Service Co., 275 S.W.2d 833, 840 (Tex. App. 1995). The party seeking reformation has the burden of proving both an antecedent agreement and a mistake in reducing the agreement to writing. Fruge, 663 F.3d at 748; Huttleston v. Beacon National Ins. Co., 822 S.W.2d 744, 746 (Tex. App. 1992). The parties may present parol evidence to prove a mutual mistake, even if the writing is unambiguous. Samuels v. State Farm Mut. Auto. Ins. Co., 939 So. 2d 1235, 1240 (La. 2006); Brinker v. Wobaco Limited Trust, 610 S.W.2d 160, 164 (Tex. App. 1980).[7] The fact that a third party may be affected by reformation of the contract

---

[7] While OES and Anadarko rely on Brinker, Liberty Mutual argues, "[B]oth parties fail to mention that the court in Brinker rejected the reformation argument made by the parties, holding, 'There is positive evidence of mistake; yet there are circumstances which bear upon the credibility and accuracy of the testimony which might lead reasonable minds to reject it.'" (Doc. 223) (citing Brinker, 610 S.W.2d at 166). However, Liberty Mutual drastically misstates the holding by the Court of Civil Appeals of Texas in Brinker. The trial court had denied reformation and refused to admit evidence seeking to establish the true intention of the parties and evidence that a mistake had been made when drafting the agreements. Brinker, 610 S.W.2d at 162. The appellate court reversed the judgment of the trial court. Id. at 166. The appellate court determined that there was not sufficient evidence in the appellate

does not, itself, bar reformation.[8] See Samuels 939 So. 2d at 1241; Merrimack Mut. Fire Ins. Co. v. Allied Fairbanks Bank, 678 S.W.2d 574, 577 (Tex. App. 1984).

Anadarko, OES, Dolphin, and Smith urge that this Court apply Texas law. Liberty Mutual does not specifically urge the application of any state's law so long as this Court rules consistently with the holding in American Electric Power Co. v. Affiliated FM Insurance Co. (hereinafter "AEP"), which applied Louisiana law. 556 F.3d 282, 288 (5th Cir. 2009). However, no party has identified any conflict in the decisional or statutory law of Texas and Louisiana. While OES and company urge us to apply Texas law, they heavily cite Louisiana case law in their motions for reconsideration and even admit that "Louisiana law does not materially conflict with Texas law" (Docs. 127, 222). Consequently, we proceed with our analysis applying Louisiana law.[9]

**B.    Contract Reformation under Louisiana Law**

Under Louisiana law, parties to a contract may invoke the equitable doctrine of contract reformation to correct an error made in reducing the agreement to writing. See Fruge v. Amerisure Mut. Ins. Co., 663 F.3d 743, 748 (5th Cir. 2011). The party seeking reformation has the burden of showing by clear and convincing evidence that there was both an antecedent agreement and an error in reducing the

---

record to render a judgment as a matter of law and so remanded the case for a new trial. Id. Therefore, to say the court rejected the reformation argument is flatly wrong. Indeed, the court *accepted* the legal argument of the appellants, but, because the trial court never made any factual findings as to whether a mutual mistake had been made, it would have been inappropriate for the court to weigh evidence and make a finding while on appeal.

[8] Under certain circumstances third parties may block reformation. See, e.g., Washington v. Savoie, 634 So. 2d 1176 (La. 1994) (holding that injured third-party tort victims can block contract reformation that would limit the tort victim's recover); Alkas v. United Sav. Ass'n of Texas, Inc., 672 S.W.2d 852, 859 (Tex. App. 1984) (holding that subsequent lienholders can prevent contract reformation).

[9] We note however that the result would be the same under Texas law. Indeed, the path to reformation may even be easier under Texas law.

agreement to writing. Id. The party may present parol evidence to prove mutual error even if the language in the writing is clear and unambiguous. Id. There are three recent cases applying Louisiana law where a third party insurance company sought to prevent two parties from invoking the equitable doctrine of contract reformation. We will look at each of these cases in turn.

The lawsuit in Samuels arose out of a fatal motor vehicle accident in which the tortfeasor had three levels of insurance. 939 So. 2d at 1237. First, he had an automobile policy with State Farm Fire and Casualty Company ("State Farm"). Id. Second, he had an excess insurance policy from State Farm to serve as an umbrella over his automobile, homeowner, and watercraft policies, each of which was expressly required in the excess insurance policy. Id. Third, the tortfeasor had a secondary excess insurance policy with Evanston Insurance Company ("Evanston"), which was intended to be in excess of not only the primary policies, but also the State Farm umbrella policy Id. Thus, the Evanston policy would not be activated until both State Farm policies had already paid their limits. Id. An excess policy requires predetermined underlying coverage to be paid out before excess coverage is activated. Id. at 1239 (quoting Louisiana Ins. Guar. Ass'n v. Interstate Fire and Cas. Co., 630 So. 2d 759, 767 (La. 1994)).

However, the Evanston agent misidentified the State Farm umbrella policy on the declarations page, calling it a "homeowner's policy" and providing an incorrect policy number. Id. at 1238. As a result, State Farm argued that Evanston's policy was not excess to the State Farm umbrella policy and that both insurers should pay out on

a pro-rata basis.[10] Id. at 1239. State Farm was correct: the plain language of the Evanston policy did not make the State Farm umbrella policy subordinate. Evanston and its insured sought to reform the policy to reflect their intent that the policy be a secondary umbrella. Id. at 1238. To prove the antecedent agreement and drafting error, Evanston relied on affidavits from three insurance agents involved in forming and renewing the policy as well as the marked difference in premiums for the two umbrella policies. Id. at 1237-38. Significantly, the annual premium for the State Farm policy was $1,385.00 (for $2 million in coverage), and the annual premium for the Evanston policy was $577.50 (also for $2 million in coverage). Id. at 1237. Consistent with the purpose of excess insurance, this lower premium reflected the lower risk borne by Evanston, whose coverage would not be activated until the State Farm limits were exceeded. The appeals court reversed the trial court's denial of reformation. Id. at 1239.

The Louisiana Supreme Court held that Evanston and its insured were entitled to reform their contract despite its effect on the third party, State Farm. Id. at 1241. The court found that Evanston had met its burden of proof through the affidavits submitted and the corroborating evidence of divergent premiums. Id. at 1240. As to the affected third party, the court reasoned that State Farm was not prejudiced by reformation because it "in no way relied on" the mistake, nor did it issue the policy under the mistaken presumption that Evanston would provide pro-rata coverage. Id. The court could not "ignore the clear intent of the parties to the fortuitous benefit of a

---

[10] Both policies had "other insurance" clauses, which where mutually repugnant.

third party insurance company who did not even rely on this error in issuing its own policy." Id. at 1241.

Three years after Samuels, the Fifth Circuit considered a contract reformation argument in AEP. Affiliated FM Insurance Company ("Affiliated") refused to pay American Electric's claim for employee theft under its prior loss clause. AEP, 556 F.3d at 284-85. Under the prior loss clause, if American Electric discovered losses that occurred before the policy period, Affiliated would still cover them so long as they would have been covered by whatever policy American Electric had at the time of the loss. Id. In that sense, Affiliated assumed liability through all of American Electric's previous policies, whether with Affiliated or not. When American Electric acquired another utility conglomerate, Central & Southwest Corporation ("CSW"), it sought to amend its Affiliated policy to cover its CSW and its subsidiaries as well. Id. After American Electric submitted copies of CSW's old policies, Affiliated amended the policy. See id. at 284.

Soon after, American Electric discovered losses at one of CSW's subsidiary limited liability companies ("LLCs") and submitted a proof of loss. Id. Affiliated denied the claim for several reasons,[11] including its position that CSW's then-existing Chubb Insurance Group policy only covered employee theft at subsidiary corporations. Id. at 285. At summary judgment, American Electric argued that the term "corporation" was ambiguous and should be interpreted to include unincorporated entities such as LLCs. Id. American Electric also submitted affidavits

---

[11] Affiliated actually argued in briefing that the subsidiary at issue, Nuvest, LLC, was not actually a subsidiary at all. Brief for Appellee at 25, AEP, supra (No. 07-31061) 2008 WL 5972078 at *13. Rather, CSW was a "member" of Nuvest with only a 4.9% voting interest. Id. Secondly, the theft at issue was by another member of the LLC, which further casts doubt on whether the employee theft coverage would apply. Id.

from CSW and Chubb stating that the parties meant for the term "corporations" to include LLCs. Id. The district court, however, struck the affidavits as parol evidence, inadmissible for the purpose of injecting ambiguity into an otherwise clear and unambiguous contract. Id. On appeal, American Electric pressed the argument that corporations included LLCs, but also raised a brief alternative argument of contract reformation. Brief for Appellant at 13, American Electric, supra (No. 07-31061) 2008 WL 5972077 at *7.

The Fifth Circuit affirmed the district court's grant of summary judgment, AEP, 556 F.3d at 288, and reasoned that, while the insurance company in Samuels did not rely in any way on the error in the other policy, Affiliated did rely on the unambiguous language of the Chubb policy. Id. at 287-88. Even if CSW and Chubb had an informal agreement that the word "corporation" had a broader than usual meaning, there was "no indication that Affiliated knew or should have known" of such agreement. Id. at 288. Because Affiliated relied on the clear and unambiguous language of the Chubb Policy, the court reasoned that allowing American Electric to change the terms after the fact "would be contrary to the basic norms of fairness and notice." Id. Furthermore, American Electric never truly sought to establish an antecedent agreement followed by a drafting error. Id. The circuit court concluded that Affiliated was simply re-framing the same interpretation argument as a request for reformation in order to avoid the parol evidence rule. Id. While parol evidence is admissible to establish such an agreement and mutual mistake, American Electric continued to argue and rely on evidence that the term corporation in the contract

meant something different from its plain meaning (*i.e.*, an incorporated entity), which, the court said, is an issue of interpretation, not reformation. See id.

Two years later, the Fifth Circuit decided another contract reformation case, this time reversing the district court's refusal "to consider extrinsic evidence to prove the theory of mutual mistake." Fruge, 663 F.3d at 745. Two insurance companies, Chubb and Amerisure, had been defending a company until one realized that it had mistakenly listed the defendant as an additional insured and withdrew its defense. Id. at 746. The remaining insurer, Chubb, filed a crossclaim for a declaration of Amerisure's obligation to defend. Id. The district court rejected Amerisure's contract reformation argument on two grounds: (1) the policy unambiguously listed the company as an additional insured so further interpretation was prohibited; and (2) Louisiana law prohibits reformation that limits recovery by a third party tort victim. Id. at 747. The Fifth Circuit, however, reasoned that the lack of ambiguity of the contract does not prohibit reformation of a mutual mistake. Id. ("In rejecting [the reformation] argument, the district court failed to acknowledge that '[t]here is ample authority in [Louisiana] jurisprudence to allow reformation of an insurance policy when, because of mutual error or mistake, the policy fails to reflect the intent of the parties.'") (quoting Staten v. Sec. Indus. Ins. Co., 414 So. 2d 1328, 1331 (La. App. 2d Cir. 1982) (alteration in original). As to the district court's second ground, the Fifth Circuit reasoned, "The 'third party' in this case is an insurance company that expressly contracted for a risk without relying in any way on any other coverage." Id. at 747-48. The Fifth Circuit reversed and remanded to the district court for consideration of the parol evidence of mutual mistake. Id. at 750.

C.      Reformation of the OES-Anadarko Contract

In order to permit OES and Anadarko to reform their contract, we must determine: (1) whether there was an antecedent agreement that OES and Anadarko intended a knock-for-knock indemnification scheme; (2) whether OES and Anadarko mutually erred when reducing this agreement to the written OES-Anadarko Contract; and (3) whether Liberty Mutual, a third party, will be unfairly prejudiced by reformation.

1.      Antecedent Agreement and Mistake in Reducing the Agreement to Writing

First, we must decide whether the record contains clear and convincing evidence of an antecedent agreement between OES and Anadarko that OES would be liable for injury to its own employees by indemnifying companies, such as Dolphin and Smith, with whom Anadarko contracted to work on oil and gas ventures alongside OES. This question is a convoluted one because the agreement between OES and Anadarko did not govern just one discrete project but was a master service agreement meant to govern their interactions for years to come on each of many engagements. The question is further muddled by the parties' haphazard use of the terms "contractor" and "subcontractor."

We begin by looking at the evidence that OES and Anadarko intended to enter into a "knock for knock" indemnity scheme when they entered into the master service agreement on November 1, 2000. By then, knock for knock schemes were common in the oil and gas industry in the Gulf of Mexico. See W. Robins Brice, On the Hook Offshore Remedies, Liabilities, Indemnities, and Insurance Solutions in Offshore Employers Liability, Fed. Law., FEBRUARY 1999, at 26, 28. Generally, in a knock for

knock scheme, each company on a job agrees to indemnify the others so that each is liable for injury to its own employees regardless of fault. See Comeaux v. Coil Tubing Servs., LLC, 172 F. App'x 57, 63 (5th Cir. 2006); Christopher L. Evans & F. Lee Butler, Reciprocal Indemnification Agreements in the Oil Industry: The Good, the Bad and the Ugly, 77 Def. Couns. J. 226, 226 (2010) ("In other words, each party agrees to take full responsibility for all bodily injury or property damage claims made by its own employees, regardless of which party may actually be responsible for the injury."). This roughly apportions the insurable risk each party bears to their relative size and role in the venture. Evans and Butler, supra at 228 ("[E]ach party can better determine the amount and cost of the insurance they will need for the job by simply knowing how many people will be at the work site that fall under the contracting party's scope of liability."). As a result, smaller companies can compete for jobs without potentially cost-prohibitive insurance premiums because "[a] contracting party with fewer workers at the site for whom the party is legally responsible will have a relatively smaller exposure than a company that has many workers at the site who might be injured if an accident occurs." Id. Costs are further reduced by a decreased need to litigate the issue of liability among multiple defendants as liability is assumed irrespective of fault or negligence of any other party. Id. at 227.

We are convinced that OES and Anadarko intended to effect a knock for knock indemnity scheme whereby OES would accept liability for injury to an OES employee by indemnifying Anadarko and other oilfield service providers with whom Anadarko contracted. The parties demonstrated this intent through: (1) the identical, reciprocal

language of the indemnity clauses[12] in the November 2000 agreement, itself; (2) prior

conduct consistent with the understanding that both parties had agreed to knock for

knock indemnification (See docs. 111-6, 111-26); (3) the depositions of OES (doc. 111-

---

[12] 2. Definitions –
****
(c) "Company Indemnitees" and "Company's Indemnitees" means Company its
Affiliates, its joint owners and venturers, if any, and its and their directors, agents,
representatives, employees and insurers and its subcontractors and their employees.
(d) "Contractor Indemnitees" and "Contractor's Indemnitees" means Contractor its
Affiliates, its joint owners and venturers, if any, and its and their directors, agents,
representatives, employees and insurers and its subcontractors and their employees.
****
14. Indemnities:
(a) Bodily Injury, Death, and Damage to Property of Contractor's Employees and
Subcontractors:
Notwithstanding anything to the contrary in other provisions of this Agreement,
CONTRACTOR AGREES TO BE RESPONSIBLE FOR AND ASSUME ALL LIABILITY
FOR AND HEREBY AGREES TO DEFEND, RELEASE, INDEMNIFY, AND HOLD
HARMLESS THE COMPANY INDEMNITEES AGAINST CLAIMS ARISING IN
CONNECTION WITH: (I) BODILY INJURY AND/OR DEATH TO CONTRACTOR'S
EMPLOYEES, CONTRACTOR'S SUBCONTRACTORS AND THEIR EMPLOYEES, AND
CONTRACTOR'S INVITEES; AND/OR (II) DAMAGE TO PROPERTY OF
CONTRACTOR'S EMPLOYEES AND CONTRACTOR'S SUBCONTRACTORS AND
THEIR EMPLOYEES, AND CONTRACTOR'S INVITEES; ARISING OUT OF OR
RESULTING FROM THE PERFORMANCE OF THIS AGREEMENT, REGARDLESS OF
FAULT, THE INDEMNITY OBLIGATIONS SET FORTH IN THIS PARAGRAPH 14(a)
SHALL INCLUDE ANY MEDICAL, COMPENSATION, OR OTHER BENEFITS PAID BY
COMPANY OR ANY MEMBER OF COMPANY INDEMNITEES AND SHALL APPLY
EVEN IF THE EMPLOYEE IS DETERMINED TO BE THE BORROWED OR STATUTORY
EMPLOYEE OF COMPANY OR ANY OTHER MEMBER OF COMPANY INDEMNITEES.
(b) Bodily Injury, Death, and Damage to Property of Company's Employees and
Subcontractors:
Notwithstanding anything to the contrary in other provisions of this Agreement,
COMPANY AGREES TO BE RESPONSIBLE FOR AND ASSUME ALL LIABILITY FOR
AND HEREBY AGREES TO DEFEND, RELEASE, INDEMNIFY, AND HOLD HARMLESS
THE CONTRACTOR INDEMNITEES AGAINST CLAIMS ARISING IN CONNECTION
WITH: (I) BODILY INJURY AND/OR DEATH TO COMPANY'S EMPLOYEES,
COMPANY'S SUBCONTRACTORS AND THEIR EMPLOYEES, AND COMPANY'S
INVITEES; AND/OR (II) DAMAGE TO PROPERTY OF COMPANY'S EMPLOYEES AND
COMPANY'S SUBCONTRACTORS AND THEIR EMPLOYEES, AND COMPANY'S
INVITEES; ARISING OUT OF OR RESULTING FROM THE PERFORMANCE OF THIS
AGREEMENT, REGARDLESS OF FAULT, THE INDEMNITY OBLIGATIONS SET
FORTH IN THIS PARAGRAPH 14(b) SHALL INCLUDE ANY MEDICAL,
COMPENSATION, OR OTHER BENEFITS PAID BY CONTRACTOR OR ANY MEMBER
OF CONTRACTOR INDEMNITEES AND SHALL APPLY EVEN IF THE EMPLOYEE IS
DETERMINED TO BE THE BORROWED OR STATUTORY EMPLOYEE OF
CONTRACTOR OR ANY OTHER MEMBER OF CONTRACTOR INDEMNITEES.

(Doc. 224-4).

6) and Anadarko (doc. 111-15); and (4) affidavits from OES's insurance broker (doc. 111-26) and Jeffrey Lippold, an oil and gas consultant (doc. 111-25).

In November 2000, OES and Anadarko entered into a master service agreement not for a discrete job, but to govern their interactions over the course of numerous jobs for years to come. Therefore, in drafting the reciprocal indemnification clauses, the scrivener had to use general terms such as "agents," "insurers," and "subcontractors" to account for the fact that these could change over time and even vary from job to job (for example, OES changed insurers several years into the contract). Thus, while the contract does not specifically name Dolphin or Smith as indemnitees, we still find that OES intended to indemnify Dolphin, Smith, and other companies hired by Anadarko to work alongside OES because otherwise the benefits of the knock for knock scheme (reduced litigation costs, insurable risk proportional to size and scope of each participant's role, etc.) could not be realized.

We find the identical and reciprocal language used in the indemnity agreements, a key component of a knock for knock scheme, to be very strong evidence of OES's and Anadarko's intent to enter into such an arrangement. These indemnity provisions are not the result of a party with superior bargaining power transferring risk to the other party. Rather, the reciprocal language is consistent with a knock for knock scheme designed to assign risk for death, injury, and property damage to the employer.

We find that OES and Anadarko had acted consistent with this understanding prior to the instant litigation. In July of 2001, William C. Thibodeaux, an OES employee, was injured aboard a drill ship owned by Diamond Drilling, which was

working for Anadarko under a daywork drilling contract (Doc. 111-8). Upon being sued, Diamond tendered its defense and indemnity to Anadarko, which accepted and tendered to OES. Id. OES accepted the tender of Anadarko *and* Diamond pursuant to the same indemnity provision of the OES-Anadarko Contract at issue in this case (Doc. 111-19). The daywork drilling contract between Anadarko and Diamond (doc. 111-19) is nearly identical to the daywork drilling contract between Anadarko and Dolphin (doc. 111-5), including using the defined terms "Operator" for Anadarko and "Contractor" for each respective drilling company. Nevertheless, OES accepted the Diamond tender because it had agreed with Anadarko to indemnify and defend such companies who had contracted with Anadarko for tort liability to an OES employee. Furthermore, OES and Anadarko acted in the same fashion after Plaintiff Richard's injury. The realization that the written contract may not have reflected the actual agreement of the two parties did not occur until after Liberty Mutual denied insurance coverage.

We find that the depositions of OES (doc. 111-6) and Anadarko (doc. 111-15) and the affidavits from Jim Falanga[13] (doc. 111-26) and Jeffrey Lippold (doc. 111-25) support our conclusion. The fact that depositions and affidavits are created after litigation has begun and theories of the case are already forming is not lost on the Court. However, we find that the evidence they contain is consistent with the evidence that predates this lawsuit. Furthermore, when the Louisiana Supreme Court allowed two of the parties in Samuels to reform their contract, the court relied primarily on affidavits along with one piece of contemporaneous evidence: the

---

[13] Mr. Falanga noted OES's concern with maintaining coverage for the contractual liability it had assumed such as that for the injuries to Mr. Thibodeaux and attached the loss run he provided to Liberty Mutual.

difference in premiums for the two umbrella policies. 939 So. 2d at 1240. Here, representatives of OES and Anadarko explained, in their depositions, the understanding that they had reached was a knock for knock indemnity scheme. Samuel Broussard, Vice-President of Finance and Risk Management for OES, stated in his deposition that he negotiated the contract with Anadarko, that he understood the contract to contain knock for knock indemnities, and, in fact, that he did not even have authority to enter into any contracts without knock for knock indemnities (Doc. 111-6 at 7-8, 18-19). Likewise, Stephen Foster, Assistant Treasurer and Risk Manager for Anadarko, stated in his deposition that it was Anadarko's intent that if there were an injury to an OES employee who then sued Anadarko and other companies working for Anadarko that OES would indemnify Anadarko and the other companies for those claims by the OES employee (Doc. 111-15 at 7-8, 25).

We find the evidence clear and convincing that OES and Anadarko had intended a knock for knock indemnity scheme that would require, under the circumstances of Mr. Richard's injury, OES to indemnify Anadarko, Smith, and Dolphin. Because we decline to revisit the Court's previous rulings interpreting the OES-Anadarko Contract, we find that OES and Anadarko mutually erred during drafting, because the written contract did not effect their intended indemnity scheme.

### 2.    Effect of Contract Reformation on Third Party Liberty Mutual

Liberty Mutual urges that this Court apply the same reasoning that the Fifth Circuit used in AEP to deny contract reformation. 556 F.3d 282. There, the court found that an innocent, third party insurer, in assuming liability under an old policy, had

relied on that policy's clear and unambiguous language. <u>Id.</u> at 287-88. The court reasoned that allowing the original insured to "reform[] the contract's unambiguous terms . . . would be contrary to basic norms of fairness and notice." <u>Id.</u> at 288. The third party insurer had relied on the actual words in the policy and neither "knew [n]or should have known of an informal understanding between [the original insured and insurer] regarding the meaning of 'corporation.'" <u>Id.</u> The evidence of this alleged informal understanding was parol evidence inadmissible for the purpose of inserting ambiguity into an unambiguous contract. <u>Id.</u> While the original insured tried to argue contract reformation, it never truly alleged an antecedent agreement and subsequent drafting error, but rather based its reformation on argument on the parties' mutual understanding that a term they used meant something other than its ordinary meaning. <u>See</u> <u>id.</u> Of course, the Fifth Circuit was not fooled and accurately labeled the original insured's argument an "attempt[] to make an end-run around the parol-evidence rule by framing its argument as a request for reformation." <u>Id.</u>

Relying heavily upon this quote from <u>AEP</u>, Liberty Mutual argues that "OES and Anadarko should not be allowed to make an end-run around the parol evidence rule by framing its argument as a request for reformation" (Doc. 223). However, Liberty Mutual has consistently pointed to other parol evidence to support its own interpretation of the OES-Anadarko Contract. Liberty Mutual's determination that Dolphin and Smith are not "subcontractors" under the OES-Anadarko Contract was not based on any language within the four corners of that contract. Rather, Liberty Mutual points to *other contracts*, *i.e.* parol evidence, in order to conclude that Dolphin and Smith are "contractors." Because, in completely separate contracts, to which

OES was not even a party, Anadarko labeled Dolphin and Smith with the defined term "Contractor," Liberty Mutual has argued that Dolphin and Smith cannot be considered "subcontractors" under the OES-Anadarko Contract. Thus, Liberty Mutual relies on parol evidence to reach its own self-serving conclusion, but now implores us not to let OES and Anadarko make the said "end-run." Yet, even assuming the argument may have had traction in AEP, the parol evidence offered in there differs significantly from that presented in this case. That is a clear reason for distinguishing AEP. The factual distinctions are salient.

In 2005, OES, which was then insured by Zurich Insurance Company ("Zurich"), began to shop its risk through an insurance broker (Doc. 222-9). Liberty Mutual then competed for OES's risk, ultimately winning the contract by quoting a lower premium rate than Zurich (Doc. 111-6 at 37). Knock for knock indemnity schemes were common practice in the industry by that time. Furthermore, during these negotiations, OES's broker informed Liberty Mutual that OES wished to have the same blanket additional insured endorsement it had with Zurich, which would extend insurance coverage to parties OES agreed in writing to indemnify (Docs. 87, 222-9). The broker also provided Liberty Mutual with a "Loss History" that included, inter alia, the claims paid out by Zurich on the Thibodeaux case per the same contract (the OES-Anadarko Contract) (Doc. 222-9). Consequently, Liberty Mutual was fairly on notice that OES intended to indemnify other oilfield contractors and bought an endorsement specifically to insure such contractual liability.

Liberty Mutual unequivocally did not study, review, or rely on the language of the OES-Anadarko Contract prior to issuing the Policy to OES (See doc. 222-9). This is

22

in stark contrast to the insurance company in <u>AEP</u>, which had relied on the old policy language prior to amending its own. It was only after OES made an insurance claim that Liberty Mutual reviewed the OES-Anadarko Contract and found the drafting omission and denied coverage. Like the Louisiana Supreme Court, we will not "ignore the clear intent of the parties to the fortuitous benefit of a third party insurance company who did not even rely on this error in issuing its own policy." <u>Samuels</u>, 939 So. 2d at 1241.

OES and Anadarko presented compelling parol evidence that they had entered into an agreement to provide knock for knock indemnities covering companies such as Smith and Dolphin. Parol evidence is admissible to establish such an antecedent agreement and mutual error as OES and Anadarko have done. Parol evidence, however, is inadmissible for purposes of interpreting unambiguous language in a written agreement as the parties sought to do in <u>AEP</u>. The alleged antecedent agreement in that case was nothing more than an agreement that a word meant something different than it normally does. Here, OES and Anadarko have convincingly alleged a mutually intended indemnification scheme that they failed to effect properly in their written agreement because they failed to use designations and provisions that accurately reflected all of the relationships.

### C.    Liberty Mutual's Summary Judgment Motion

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving

23

party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion." Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to judgment as a matter of law.

Liberty Mutual desires summary judgment in their favor on the counterclaim filed by Dolphin and Smith for coverage and defense under the Liberty Mutual Policy (Doc. 200). Liberty Mutual's argument is based upon the Court's previous finding that Dolphin and Smith are not additional insureds based upon the language of the Policy and the OES-Anadarko Contract. Id. In light of our ruling here to allow OES and Anadarko to reform their contract, we find that Liberty Mutual is not entitled to judgment as a matter of law.

III.   Conclusion

For the foregoing reasons, we find that OES and Anadarko are entitled to reform their contract as it relates to this litigation. Accordingly, and the Motions for Reconsideration (Docs. 211, 222) will be **GRANTED** and the Motion for Summary Judgment (Doc. 200) by Liberty Mutual will be **DENIED**.

SIGNED on this 24 day of March, 2015 at Alexandria, Louisiana.


DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT